## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| DR. CAROLINE DIAZ, | ) |
| | ) |
|     Plaintiff, | ) |
| | )    Civil Action |
| v. | )    File No.: _____ |
| | ) |
| THE WESTMINSTER SCHOOLS, | ) |
| INC., KELLEY DAY, and CHRISTA | ) |
| HANSEN, | ) |
| | ) |
|     Defendants. | ) |
| _____ | ) |

## <u>COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF</u>

Plaintiff, Dr. Caroline Diaz, submits the following Complaint for Damages and Equitable Relief against Defendants The Westminster Schools, Inc. ("Westminster"), Kelley Day, and Christa Hansen showing the Court as follows:

## <u>INTRODUCTION</u>

1.

This is an employment case arising from race and national origin discrimination and retaliation in violation of 42 U.S.C. § 1981 ("Section 1981") and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII").

2.

Dr. Diaz—an Asian American woman of Filipino, Chinese, and Japanese descent—was a high-performing and professional Preschool Director at Defendant Westminster, which is a Christian, independent day school. Dr. Diaz began working at Westminster in February of 2015 and loyally served as the Preschool Director for over six years. Under her directorship, the preschool program grew from eight children to 125.

3.

Nevertheless, Defendant Westminster terminated Dr. Diaz on May 4, 2021, after subjecting her to racially discriminatory and retaliatory treatment, including questioning of her intelligence, competence, and integrity based on her ethnic background, as well as exhibiting contempt toward her for publishing education industry academic articles opposing and shedding light on action prohibited by Title VII, including race discrimination against educators of Asian descent.

4.

Dr. Diaz asserts claims for race and national origin discrimination and retaliation in violation of Title VII and 42 U.S.C. § 1981, as well as breach of contract in violation of Georgia law. She seeks back pay and the lost economic

benefits of her employment, compensatory and punitive damages, reasonable attorney's fees and costs of litigation, and all other relief this Court may deem just.

## JURISDICTION AND VENUE

### 5.

Plaintiff's claims present federal questions over which this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a).

### 6.

The violations of Plaintiff's rights occurred in the Northern District of Georgia. Venue is proper under 28 U.S.C. § 1391(b) and (c), as a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in the Atlanta Division of the United States District Court for the Northern District of Georgia.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

### 7.

Dr. Diaz satisfied all administrative prerequisites to perfect her claims under Title VII. Specifically, Dr. Diaz timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), and the EEOC issued a notice of right to sue within ninety days of the filing of this Complaint.

## **PARTIES**

8.

Plaintiff Caroline Diaz is an Asian American female who currently resides in DeKalb County, Georgia, which is in the Northern District of Georgia. She subjects herself to the jurisdiction of this Court.

9.

Defendant Westminster is a domestic corporation registered to do business in the state of Georgia and is subject to the jurisdiction of this Court. Westminster may be served with process by personal service upon its registered agent for service of process: Antoinette Boyd, 1424 W Paces Ferry Rd NW, Atlanta, GA, 30327.

10.

Defendant Kelley Day was Dr. Diaz's supervisor. Day may be served with process by personal service at her home address.

11.

Defendant Christa Hansen worked in Westminster's Human Resources department. Hansen may be served with process by personal service at her home address.

## FACTS

### *Dr. Diaz's employment with Westminster*

12.

Dr. Diaz is an Asian American female of Filipino, Chinese, and Japanese descent. Dr. Diaz immigrated to the United States from the Philippines.

13.

From February of 2015 until her termination on May 4, 2021, Dr. Diaz worked for Westminster as the Preschool Director.

14.

At all times relevant to this Complaint, Dr. Diaz was the only Asian person in any kind of leadership position at Westminster.

15.

Dr. Diaz's son attended Westminster as a student during the 2020-2021 school year.

16.

Dr. Diaz holds a Bachelor of Arts degree in Education that she received in 1996 from De La Salle University in Manila, The Philippines. She also holds a Doctor of Education in Educational Leadership from Georgia State University that she received in 2022.

17.

At all times relevant to this Complaint, Dr. Diaz had a contract of employment with Westminster.

**_Defendant Day's discriminatory comments and conduct_**

18.

Starting in or around November 2019, Kelley Day began supervising Dr. Diaz.

19.

Day is a white American.

20.

In the course of her employment, Dr. Diaz experienced offensive and racist comments about her from Day.

21.

On April 16, 2020, Dr. Diaz published an op-ed about educating preschoolers virtually during the pandemic in _Education Week_ magazine, an industry publication that is widely read and circulated at Westminster.

22.

In response to this article, shortly after its publication, Defendant Day said to Dr. Diaz: "Nice article, Caroline. How did you learn how to speak and write in

English? How do you even know the meaning of the words 'shuttered' and '*nadir'*?"

### *Dr. Diaz complains to Hansen about Day*

23.

In August of 2020, Dr. Diaz complained to Hansen in Human Resources of bullying and harassment by Day. Dr. Diaz asked if she had any options because she was constantly mistreated by Day.

24.

Dr. Diaz complained that Day declined to discipline a white American teacher, Kelley King, whose actions or inactions resulted in a preschool child absconding the classroom and wandering into the Westminster parking lot.

25.

Because this child could have been seriously injured or worse, Dr. Diaz wanted to issue discipline, but Day would not approve discipline and instructed Dr. Diaz to just "let it go" and not document anything.

26.

Defendant Hansen, who manages the school's Human Resources department, discouraged Dr. Diaz from complaining about Day, responding that Dr. Diaz should just "understand" Day, that Dr. Diaz was not the only one complaining about Day, and that there was nothing Hansen could do because Day was a close friend of

Westminster's Chief Financial Officer, Antoinette Boyd.

27.

Hansen also told Dr. Diaz that it was in her best interest to "lay low and be agreeable."

28.

Dr. Diaz has reported other unprofessional or unsafe behavior directly to Day, only for Day to fail to respond effectively. For example, Day refused to allow Dr. Diaz to discipline teachers who are not Asian, who:

(1) Slept in the classroom while watching infants;

(2) Were repeatedly tardy or absent from work; or

(3) Used their cell phones incessantly while on the clock watching toddlers.

29.

Among the teachers who engaged in this conduct that went undisciplined was Dana Jenkins, a Black female. Day's rationale for refusing to allow discipline was that "Dana is Black and people like her play the race card."

***Day continues to discriminate against Dr. Diaz and other Asian teachers***

30.

Day has discriminated against other Filipinos who worked in the preschool program.

8

31.

In the spring of 2021, Dr. Diaz requested an upward salary adjustment for ten teachers, six of whom were white Americans, and four of whom were Filipina women. One of the requirements for the upward adjustments was proof of a college degree.

32.

Day called Dr. Diaz on March 15, 2021, demanding to see proof of the college transcripts of only the four Filipina women because, based on their heavy accents, she did not believe that they held degrees, and so claimed she could not justify their salary adjustment.

33.

Day did not demand credentials or transcripts for any of the white teachers.

34.

Dr. Diaz expressed opposition to Day's racial stereotyping of the Filipina teachers, pointing out to Day that her assumptions about the teachers' lack of education based on their accents were false and racially discriminatory.

35.

Dr. Diaz also informed Day that the four teachers were well-educated, noting that two of the teachers were pharmacists back in the Philippines and one was an information technology professional.

36.

In further opposition to Day's efforts to discriminate against the four Filipina teachers, Dr. Diaz sent Day all ten teachers' college transcripts, not just those of the Filipina teachers, to demonstrate that Westminster should be treating all the teachers equally without regard for their race or national origin.

37.

After Dr. Diaz produced documentation proving all four Filipina women held college degrees, Day remarked, "It is hard to believe [Filipina teachers] have a Bachelor's considering how they speak in English." Dr. Diaz also expressed concern about this statement to Ms. Day.

38.

In or around February and March 2021, Day and Hansen pressured Dr. Diaz to work during the upcoming summer months even though this was not a requirement of her contract. They did not exert this pressure on similarly situated non-Asian individuals, including the afterschool program director and the lower

school director of operations and communications.

39.

In response, in or around February and March 2021, Dr. Diaz opposed Westminster's efforts to have her work during the summer. Specifically, she complained to Day that the afterschool director (who is a white American) did not have to come in for the summer. In response, Day told Dr. Diaz that Boyd would be "hearing about" Dr. Diaz's opposition to this disparate treatment.

40.

Dr. Diaz's opposition to Day's and Hansen's race- and national origin-based decision-making regarding requiring her to work during the summer in contrast with similarly situated, white American employees constituted protected activity.

***Dr. Diaz engages in more protected activity and publishes an article opposing anti-Asian racism and discriminatory treatment of Asians in the workplace***

41.

On March 22, 2021, Dr. Diaz published a second op-ed in *Education Week* on the topic of Asian Hate. The byline reads, "How anti-Asian racism has affected one educator and her family." In the article, Dr. Diaz opposed discrimination and racial inequity against Asian employees in the education industry.

42.

In this article, Dr. Diaz highlighted contemporary examples of anti-Asian discrimination she has encountered or observed, including the Trump administration labeling COVID-19 as the "Kung Flu," or the cultural norm that "Asians are taught to keep their heads down and not to rock the boat."

43.

Dr. Diaz also noted how individuals of Asian descent account for only 2% of leadership positions in early childhood education. She expressed:

> My race has meant inequity and bias. The racism can be as petty as fielding a question about how I learned to speak in English or an exclamation of how lucky I am to be from the land of Kikkoman Soy Sauce. Or it can be more significant—like being passed over for an administrator job because I was not the right skin color.

44.

She described the need not to succumb to social pressures to keep your head down and ignore racism, and that her 11-year-old son (who attends Westminster) encouraged her to "fight back," which was why she was publishing the article.

45.

Dr. Diaz's statements in this article about keeping her head down was a reference to Hansen's instruction to "lay low and be agreeable" when Dr. Diaz complained about Day's conduct towards her.

46.

Dr. Diaz's reference to administrators questioning her English-speaking skills was a reference to instances when Day expressed assumptions about her and her Filipina colleagues' education and intelligence based on their accents.

47.

On March 22, 2021, Dr. Diaz sent this article to Day and Westminster's entire administrative team, which included Hansen and Boyd.

48.

Dr. Diaz's act of sending this article to Day, Hansen, Boyd, and Westminster's administrative team constituted protected activity.

49.

The next day, on March 23, 2021, Day walked into Dr. Diaz's office and asked why she felt the need to write the article.

50.

In response, Dr. Diaz told Day that she believed it was important to express her opposition to racism, especially because she was the only Asian in an administrative position at Westminster, and that this reflected her perspective as an employee of Westminster.

51.

Dr. Diaz's response to Day's questioning of why she wrote the article constituted protected activity.

52.

Day responded, "It must be hard to be Asian right now since you caused the [corona]virus."

### Westminster terminates Dr. Diaz on pretextual grounds

53.

On May 4, 2021, Defendants Hansen and Day met with Dr. Diaz and fired her based on reports from Day that Dr. Diaz allegedly told some employees to "stick it to Westminster."

54.

Dr. Diaz never made such a comment nor did she ever tell any other employee to disparage or be insubordinate to Westminster in any way.

55.

Dr. Diaz was not told who made these allegations or given a chance to respond.

56.

Nobody, including Hansen, independently investigated Day's allegations that

formed the basis for Westminster's decision to terminate Dr. Diaz shortly after she opposed unlawful race discrimination in the workplace.

57.

In the termination meeting, Hansen told Dr. Diaz that she would be labeled as "unprofessional" in the industry.

58.

Dr. Diaz broke down crying and begged Day and Hansen to reconsider how they characterized her after her many years of loyal service. Day smirked while Dr. Diaz cried.

### *Westminster breaches Dr. Diaz's contract and further discriminates and retaliates against her through her salary and pay*

59.

On July 27, 2020, Dr. Diaz signed a 10-month contract for the 2020-2021 school year. Her compensation includes a base salary of $103,000 per year.

60.

Westminster spread salary payments for 10-month employees out over twelve months but did not require 10-month employees to work over the summer.

61.

The contract states that "If Employee's employment with Westminster

terminates prior to the last day on which Employee is scheduled to perform duties pursuant to this Contract, all compensation and employee benefits will cease as of the last day worked by Employee and will be prorated based on that portion of the Contract Term actually worked."

62.

At the time of her separation on May 4, 2021, Dr. Diaz had worked nine months out of her ten-month Contract Term. Therefore, she is entitled to receive 90% of her annual salary.

63.

At the time of Dr. Diaz's termination, Hansen directed the payroll department to "suppress" Dr. Diaz's most recent paycheck.

64.

Dr. Diaz is owed at least $15,450.03 gross salary in missed payments, plus interest, under her 10-month contract.

65.

On February 26, 2021, the Board of Trustees for Westminster issued a letter awarding a $2,000 bonus to employees who worked through the pandemic.

66.

Dr. Diaz worked throughout the school closure and the pandemic, yet the

school denied her this payment. Dr. Diaz is entitled to the $2,000 bonus she should have received and/or would have received but for her unlawful termination from Westminster, plus interest.

67.

Prior to Day assuming responsibility over Dr. Diaz's department, Dr. Diaz's former supervisor, Brent Ivey, told her she was eligible for a $5,000 annual stipend for up to three years to pursue her Ed.D.

68.

At all times relevant to this Complaint, Dr. Diaz was pursuing her Ed.D. degree at Georgia State University.

69.

Dr. Diaz received this stipend during her 2019-2020 contract year without incident.

70.

Day promised Dr. Diaz that this stipend would be available to her if she signed her 2020-2021 contract.

71.

When Dr. Diaz received her 2020-2021 contract, it did not reflect the stipend for the 2020-2021 school year.

17

72.

When Dr. Diaz asked Day about the stipend, Day accused Dr. Diaz of "gaming the system" and demanded documentation to prove Dr. Diaz was enrolled in the graduate program.

73.

Dr. Diaz complied by providing her transcripts from her Ed.D. program.

74.

Thereafter, Defendants offered Dr. Diaz a promissory note for $5,000 that would mature if she stayed at Westminster for five years; this process deviated from the stipend provided to Dr. Diaz in the past under a different supervisor, and from Defendants' treatment of similarly situated non-Asian employees who received the stipend without these conditions attached.

75.

The actions surrounding this promissory note for the stipend do not derive from any established Westminster policy or procedure and was applied only to Dr. Diaz.

76.

Dr. Diaz is entitled to the $5,000 stipend for the 2020-2021 school year as well as the $5,000 that she would have received for the 2021-2022 school year but

for her illegal termination, plus interest.

***Westminster threatens Dr. Diaz and her 11-year-old son's enrollment following termination***

77.

After Dr. Diaz was terminated, Boyd called Dr. Diaz and threatened her son's enrollment at Westminster as well as legal action against her if she disparaged Westminster to any families or in the community.

78.

Specifically, Boyd stated to Dr. Diaz, "We would love to see your son graduate from Westminster. It would be a shame if your son doesn't graduate from Westminster, but that depends on you."

79.

Because of Boyd's statements, Dr. Diaz withdrew her son out of Westminster shortly after this call.

80.

On May 12, 2021, Westminster's attorney directed correspondence to Dr. Diaz, a non-lawyer, titled "Urgent Notice and Warning." In this letter, Westminster warned Dr. Diaz that she may not "disclose any information, or make or publish any statement, or make or solicit for the media or others, or say or do anything to or in

relation to Westminster that is adverse or prejudicial to Westminster."

81.

Westminster made no qualification or exception for statutorily protected activity in threatening to take "immediate legal action," if Dr. Diaz took a position adverse to Westminster, including in legal proceedings in the exercise of her federal civil rights under Title VII or 42 U.S.C. § 1981.

82.

The misleading and bullying nature of this statement was not only illegal but falsely led Dr. Diaz to believe she had some post-employment obligation not to assert that Westminster engaged in unlawful race discrimination or retaliation.

83.

There are no post-employment covenants in Dr. Diaz's contract. Westminster's efforts to manufacture one after Dr. Diaz opposed race discrimination in employment against Asians was intended to intimidate Dr. Diaz into not asserting her legal rights in order to cover up Westminster's own wrongdoing in this matter.

84.

Westminster also made a threat to Dr. Diaz in the May 12, 2021 letter regarding the Georgia Trade Secrets Act. Specifically, Westminster's attorney misstated the law in a manner designed to cause Dr. Diaz to fear legal exposure if

she ever contacts any Westminster employee, student, or parent/family in the future, for any reason. This threat was an egregious overreach and retaliatory.

## COUNT I
## Race and National Origin Discrimination in Violation of 42 U.S.C. § 1981
### (Against all Defendants)

85.

Dr. Diaz incorporates by reference paragraphs 1 through 84 of this Complaint.

86.

Defendants discriminated against Dr. Diaz on the basis of her race as an Asian American and her national origin (Filipina, Chinese, and Japanese) by terminating her because of these protected characteristics.

87.

Day's discriminatory attitude toward Asian Americans is evidenced by her comments regarding Dr. Diaz's ability to speak English, her pattern of racially stereotyping employees of Filipino descent including but not limited to Dr. Diaz, , her discriminatory comments about Asians "causing" the coronavirus, and her more favorable treatment of similarly situated non-Asian employees.

88.

Day's and Hansen's discriminatory attitude toward Asian Americans is evidenced by their pressuring of Dr. Diaz to work during summer months while not

exerting similar pressure on non-Asian American faculty and staff, and further by creating an expectation that because Dr. Diaz is Asian, she should not be vocal or avail herself of her rights to a work environment free from race discrimination.

89.

Defendants engaged in adverse employment action by causing Plaintiff to be terminated and causing her contract rights, earned wages, and benefits of employment to be denied.

90.

Dr. Diaz was terminated based on Day's false claims that Diaz told others to "stick it to Westminster." Day was motivated by discriminatory animus and either made the decision to terminate Dr. Diaz or influenced others to terminate Dr. Diaz under the "cat's paw" theory of discrimination.

91.

Defendants' stated reason for terminating Dr. Diaz—that she had told others to "stick it to Westminster"—is false and a pretext for their true motivation.

92.

Defendants undertook their unlawful conduct intentionally and maliciously with respect to Plaintiff and his federally protected rights, entitling Plaintiff to recover compensatory and punitive damages against them.

93.

Defendants' actions were willful, wanton, and intentionally directed to harm Plaintiff.

94.

Defendants' actions were taken with reckless disregard for the probable consequences of their actions.

95.

As a direct and proximate result of the Defendants' violations of 42 U.S.C. § 1981, Plaintiff has suffered damages including lost wages, emotional distress, inconvenience, loss of benefits, humiliation, and other indignities.

96.

As a direct and proximate result of Defendants' actions against Plaintiff, she has been damaged and is entitled to the relief set forth in the Prayer for Relief below.

## COUNT II
### Race and National Origin Discrimination in Violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*
**(Against Defendant Westminster)**

97.

Dr. Diaz incorporates by reference paragraphs 1 through 84 of this Complaint.

98.

Westminster discriminated against Dr. Diaz on the basis of her race as an Asian American and her national origin (Filipina, Chinese, and Japanese) by terminating her because of these protected characteristics.

99.

Day's discriminatory attitude toward Asian Americans is evidenced by her discriminatory comments regarding Dr. Diaz's ability to speak English, her pattern of racially stereotyping employees of Filipino descent including but not limited to Dr. Diaz, her discriminatory comments about Asians "causing" the coronavirus, and her more favorable treatment toward similarly-situated non-Asian employees.

100.

Day's and Hansen's discriminatory attitude toward Asian Americans is evidenced by their pressuring her to work during summer months while not exerting similar pressure on non-Asian American faculty and staff.

101.

Westminster engaged in adverse employment action by terminating Plaintiff and denying her contract rights, earned wages, and benefits of employment.

102.

Dr. Diaz was terminated based on Day's false claims that Diaz told others to "stick it to Westminster." Day was motivated by discriminatory animus and either made the decision to terminate Dr. Diaz or influenced others to terminate Dr. Diaz under the "cat's paw" theory of discrimination.

103.

Westminster's stated reason for terminating Dr. Diaz—that she had told others to "stick it to Westminster"—is false and a pretext for their true motivation.

104.

Westminster undertook its unlawful conduct intentionally and maliciously with respect to Plaintiff and her federally protected rights, entitling Plaintiff to recover compensatory and punitive damages against Westminster.

105.

Westminster's actions were willful, wanton, and intentionally directed to harm Plaintiff.

106.

Westminster's actions were taken with reckless disregard for the probable consequences of its actions.

107.

As a direct and proximate result of the Westminster's violations of Title VII, Plaintiff has suffered damages including lost wages, emotional distress, inconvenience, loss of benefits, humiliation, and other indignities.

108.

As a direct and proximate result of Westminster's actions against Plaintiff, she has been damaged and is entitled to the relief set forth in the Prayer for Relief below.

**COUNT III**
**Retaliation in Violation of 42 U.S.C. § 1981**
**(Against all Defendants)**

109.

Dr. Diaz incorporates by reference paragraphs 1 through 84 of this Complaint.

110.

Dr. Diaz engaged in protected activity within the meaning of Section 1981 by opposing Defendants' race- and national origin-based decision-making regarding the justification of salaries for only Asian teachers.

111.

Dr. Diaz engaged in protected activity within the meaning of Section 1981 by opposing Defendants' race- and national origin-based decision requiring her to work during the summer, which they did not require of similarly-situated, non-Asian

employees.

113.

Dr. Diaz engaged in protected activity within the meaning of Section 1981 by sharing her article with Day, Hansen, and others which opposed racial discrimination and disparate treatment of herself and other Asian educational professionals in the education industry, including Westminster.

113.

Dr. Diaz engaged in protected activity within the meaning of Section 1981 in her response to Day's questioning of why she wrote the article, stating to Day that she believed it was important to express her opposition to racism, especially because she was the only Asian in an administrative position at Westminster, and that this reflected her perspective as an employee of Westminster.

114.

Defendants retaliated against Dr. Diaz by terminating her approximately five weeks after she engaged in protected activity based on nonsensical, pretextual reasons.

115.

Dr. Diaz was terminated based on Day's false claims that Diaz told others to "stick it to Westminster." Day was motivated by retaliatory animus and either made the decision to terminate Dr. Diaz or influenced others to terminate Dr. Diaz under the "cat's paw" theory of retaliation.

116.

Westminster's stated reason for terminating Dr. Diaz—that she had told others to "stick it to Westminster"—is false and a pretext for their true motivation.

117.

Defendants' termination of Dr. Diaz was an intentional and willful violation of Section 1981 in violation of Dr. Diaz's rights thereunder.

118.

Defendants undertook their unlawful conduct intentionally and maliciously with respect to Plaintiff and her federally protected rights, entitling Plaintiff to recover compensatory and punitive damages against them.

119.

Defendants' actions were willful, wanton, and intentionally directed to harm Plaintiff.

120.

Defendants' actions were taken with reckless disregard for the probable consequences of their actions.

121.

As a direct and proximate result of the Defendants' violations of Section 1981, Plaintiff has suffered damages including lost wages, emotional distress, inconvenience, loss of benefits, humiliation, and other indignities.

122.

As a direct and proximate result of Defendants' actions against Plaintiff, she has been damaged and is entitled to the relief set forth in the Prayer for Relief below.

**COUNT IV**
**Retaliation in Violation of Title VII**
**of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.***
**(Against Defendant Westminster)**

123.

Dr. Diaz incorporates by reference paragraphs 1 through 84 of this Complaint.

124.

Dr. Diaz engaged in protected activity within the meaning of Title VII by opposing Day's race- and national origin-based decision-making regarding the justification of salaries for only Asian teachers.

29

125.

Dr. Diaz engaged in protected activity within the meaning of Title VII by opposing Day's and Hansen's race- and national origin-based decision-making regarding requiring her to work during the summer in contrast with similarly situated, white American employees.

126.

Dr. Diaz engaged in protected activity within the meaning of Title VII by sharing her article with Day, Hansen, and others which opposed racial discrimination and disparate treatment of herself and other Asian American employees at Westminster.

127.

Dr. Diaz engaged in protected activity within the meaning of Title VII in her response to Day's questioning of why she wrote the article, stating to Day that she believed it was important to express her opposition to racism, especially because she was the only Asian in an administrative position at Westminster, and that this reflected her perspective as an employee of Westminster.

128.

Westminster, through Hansen and Day, retaliated against Dr. Diaz by terminating her approximately five weeks after she engaged in protected activity.

30

129.

Dr. Diaz was terminated based on Day's false claims that Diaz told others to "stick it to Westminster." Day was motivated by retaliatory animus and either made the decision to terminate Dr. Diaz or influenced others to terminate Dr. Diaz under the "cat's paw" theory of retaliation.

130.

Westminster's stated reason for terminating Dr. Diaz—that she had told others to "stick it to Westminster"—is false and a pretext for their true motivation.

131.

Westminster's termination of Dr. Diaz was an intentional and willful violation of Title VII in violation of Dr. Diaz's rights thereunder.

132.

Westminster undertook its unlawful conduct intentionally and maliciously with respect to Plaintiff and her federally protected rights, entitling Plaintiff to recover compensatory and punitive damages against Westminster.

133.

Westminster's actions were willful, wanton, and intentionally directed to harm Plaintiff.

134.

Westminster's actions were taken with reckless disregard for the probable consequences of its actions.

135.

As a direct and proximate result of the Westminster's violations of Title VII, Plaintiff has suffered damages including lost wages, emotional distress, inconvenience, loss of benefits, humiliation, and other indignities.

136.

As a direct and proximate result of Westminster's actions against Plaintiff, she has been damaged and is entitled to the relief set forth in the Prayer for Relief below.

## COUNT V
## Breach of Contract
### (Against Defendant Westminster)

137.

Dr. Diaz incorporates by reference paragraphs 1 through 84 of this Complaint.

138.

Dr. Diaz is entitled to 90% of her annual salary of $103,000 because she worked nine months out of the ten-month contract term, and the contract expressly states that her pay would be prorated for the time she worked prior to her termination.

139.

Westminster breached Dr. Diaz's contract by failing to pay her full contract salary for the time she worked, and she is therefore owed at least $15,450.03 gross salary in missed payments, plus interest, under her 10-month contract.

140.

Dr. Diaz is also entitled to the $2,000 bonus that was promised to employees who worked through the pandemic.

141.

Dr. Diaz worked through the pandemic and was not paid the promised $2,000 bonus.

142.

Dr. Diaz is also entitled to two additional stipend payments of $5,000 that were promised to her when she spoke to Ivey.

143.

As a direct and proximate result of Defendant's actions against Plaintiff, she has been damaged and is entitled to the relief set forth in the Prayer for Relief below.'

144.

Defendant Westminster has acted in bad faith and has caused Plaintiff unnecessary trouble and expense. For example, Westminster's termination of

Plaintiff's contract was based on her race and national origin, and for complaining about discrimination, not based on her performance. In addition, after Dr. Diaz was terminated, Boyd called Dr. Diaz and threatened her son's enrollment at Westminster as well as legal action against her if she disparaged Westminster to any families or in the community. In another example, after Dr. Diaz was terminated, Westminster's attorney threatened Dr. Diaz with "immediate legal action" if she contacted potential witnesses or spoke negatively and truthfully about her employment at Westminster, with no exception for communications with her own attorney or availing herself of her legal rights protected by state or federal law.

145.

As a result of Westminster's bad faith, Plaintiff is entitled to recovery of attorneys' fees pursuant to O.C.G.A. § 13-6-11.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff demands a **TRIAL BY JURY** and that the following relief be granted:

A.     That this Court take jurisdiction of this matter;

B.     That process be served;

C.     That Plaintiff be awarded a declaratory judgment that Defendants violated Section 1981 and that Westminster violated Title VII;

34

D.      That this Court enter a permanent injunction, prohibiting Defendants from engaging in unlawful employment practices, including race discrimination and retaliation;

E.      That the Court award Plaintiff back pay and lost economic benefits, plus interest, and front pay in an amount to be determined at the trial of this case;

F.      That the Court award compensatory damages in an amount to be determined by the trier of fact;

G.      That the Court award Plaintiff punitive damages against Defendants;

H.      That the Court award Plaintiff her costs in this action and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988, 42 U.S.C. § 2000e-5(k), O.C.G.A. § 13-6-11, and other applicable laws; and

I.      That the Court grant such additional relief as the Court deems proper and just.

Respectfully submitted this 9th day of July, 2022.

**BUCKLEY BEAL LLP**

By:    */s/ Anita K. Balasubramanian*
       Anita K. Balasubramanian
       Georgia Bar No. 372029
       abala@buckleybeal.com
       Andrew R. Tate
       Georgia Bar No. 518068
       atate@buckleybeal.com

35

600 Peachtree Street NE
Suite 3900
Atlanta, GA  30308
Telephone: (404) 781-1100
Facsimile:  (404) 781-1101
*Counsel for Plaintiff*